# STATE OF OREGON,
*Respondent,*

*v.*

# PHILIP KENNETH JOHNS,
*Appellant.*

(83-1074; CA A31705)

709 P2d 1121

Stephen J. Williams, Deputy Public Defender, Salem,

argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

WARREN, J.

Rossman, J., dissenting.

## WARREN, J.

Defendant was convicted of murdering his wife, who was shot in the head with a revolver. His appeal assigns error to the admission of testimony concerning two prior incidents, one a crime and the other a noncriminal act.

Defendant telephoned the police at 9:06 a.m. on November 20, 1983, to report that his wife had accidentally been shot in the bedroom of their home. The police arrived at the scene shortly thereafter and discovered the victim on the bed, lying on her back with her head on a pillow. A .38 revolver and four cartridges were on the bed near the victim's knees. She was taken to the hospital, where she died the next day. An autopsy determined the cause of death to be a gunshot wound to the back of the head. The bullet's trajectory was almost straight from the back to the front of the head, and it lodged above her left eye. The state's evidence was that the gun was fired from a distance of about six inches to two and one-half feet from the muzzle to the victim's head.

Police officers described defendant as upset, in shock, nervous and talkative when they arrived. One officer observed a small drop of blood on his finger and a gray, sparkly substance on his hand. Another officer observed "flat black stains" on defendant's hands and "some dark gray fine crystalline powder residue on the right index finger area and the area up to the webbing of the thumb."

Defendant told the officer that the black stains came from polishing shoes; a pair of black shoes wet with polish was nearby. The officers believed that the gray powder was gunpowder residue. The police did not test the substance on defendant's hand, because he washed his hands in the restroom at the police station, despite an officer's direction to him not to wash his hands. No trace of gunpowder residue was found on either defendant's or the victim's hands in subsequent testing.

Defendant described the incident as an accidental shooting. Defendant did not testify, but his version was presented to the jury through his tape recorded statement to the police, his videotaped re-enactments of his story and an officer's testimony relating statements defendant made soon after the police arrived at the scene. Defendant returned home

from his graveyard shift as a security guard shortly after 8:00 a.m. He did some things in the apartment before he entered the dark bedroom. As he walked toward the bed, there was a bright flash and a loud bang. He realized it was a gunshot and said, "Shit, don't, it's me," and lunged for the gun. He tried to take the gun out of his wife's hand and, as he landed on the bed,

> "* * * her arm just seemed to flop up against the pillow and there was a hell of a bang and she just started to moan and the first finger nearest my thumb on my right hand started to vibrate and she started to quiver and shake and I just grabbed the gun and uh opened the cylinder and just threw it down on the bed and raced around the end of the bed, grabbed the telephone and rang 911. * * *"

Defendant said that his hand was on the weapon when it discharged. The police found a bullet in the wall which had passed through a closet door and appeared to have been fired from the bed.

In sum, defendant's explanation was that his wife shot at him as he entered their bedroom and that, while he was attempting to wrest the weapon from her hand, the gun discharged the fatal shot. The evidence would support an inference either that the victim shot at defendant, thinking he was an intruder, or that she intended to kill him. Defendant's story is corroborated by the bullet fired into the closet, and his description of the fatal shooting is physically possible. Analysis of the weapon failed to identify fingerprints of either defendant or the victim.

The prosecution presented evidence concerning defendant's motive to kill his wife and attempted to discredit his explanation of the alleged accident both by arguing that his version was physically implausible and by introducing evidence of prior bad acts to establish intent in this case. Evidence admitted without objection establishes the following. Several witnesses testified that the victim had told them that she was unhappy in her marriage, wanted defendant to move out and desired to terminate the marriage. The victim told one witness that defendant had threatened her with guns about nine months before she died and that she was afraid of defendant. The state introduced letters written by the victim to her paramour within six months of her death, in which she

wrote of her dissatisfaction with her marriage and her frustration due to her inability to get defendant to move out. She wrote that she wanted to end the marriage but was "scared" to do it and afraid to file for divorce, because she feared that defendant would try to take her property. She wrote that defendant had threatened her, that she was living in fear for her safety and was afraid that defendant would try to hurt or kill her. She also wrote that defendant was the only person toward whom she had "violent thoughts" and whom she had "ever thought of hurting." The prosecution also presented evidence that the victim was afraid of guns and did not like having them in the house.

One witness for the prosecution testified that defendant had stated three months before the victim's death, "My wife's a liability and not an asset and I got to figure out how to get rid of her." Another witness testified that defendant had told her that "if he ever found his wife with another man he would kill her," that he subsequently had said he was positive his wife had a lover but he did not carry out his threat. Another witness testified that defendant had told him he was going to New Zealand around Christmas and would have between $80,000 and $100,000 when he returned, which he would like to invest. There were two policies insuring the victim's life for a total of $80,000 and naming defendant as beneficiary, for which application was made on June 13, 1983. Applications for comparable policies insuring defendant's life and naming the victim as beneficiary were made on the same date.

Defendant sought to establish that the victim knew how to use guns and was not afraid of them. He stated in a videotape that his wife feared intruders and kept a gun next to the bed and that she sometimes placed it under his pillow when he worked nights. Defendant's expert testified that evidence of gunpowder residue is very fragile and that his test firing of the weapon produced only one to three "flakes," which were easily removed by blowing on or shaking the hand. He also attempted to cast doubt on the state's assertion that the bullet was fired at least six inches from the head.

Defendant assigns error to the trial court's denying his motions to limit the introduction of two prior acts. We shall deal with each separately. The first was defendant's

assault on his former wife, Barbara Johns, not the victim in this case, which took place in New Zealand almost six years before the death in this case. Barbara was allowed to testify to the details of that assault, as well as to describe their marital situation and problems as background. In addition, a police officer from New Zealand, who was also an acquaintance of defendant's, testified about that incident. Both of the witnesses were flown from New Zealand by the state to testify.

The New Zealand incident occurred on December 25, 1977. Defendant and Barbara had been legally separated for about five months at that time. She testified that their financial situation was never good and that she felt that defendant resented the fact that she was the primary provider. Both of them applied to become traffic officers in May, 1977, and Barbara was accepted; defendant was rejected. She felt that he was "very bitter" about the rejection. She testified that he made several threats to her over the telephone during their separation, including that "if he couldn't have me no one else could" and "if we couldn't be together in life he wanted us to be together in death." She then testified about the incident which occurred on December 25:

"* * * About 8:45 on Christmas morning, Philip came to my flat. He walked in and stood with his back to the door, which he closed. In his hands he had a .22 rifle fitted with a silencer. I could see that the weapon was loaded, it had a full clip on the rifle and the bolt at that stage was open. He didn't say anything. He just stood with his back to the door shaking his head and biting his lip. And I shouted, 'No.' And he cocked the rifle, he pushed the bolt home. I felt that the only way I could get out was to try and either get the gun off him or get through the door which he was blocking. And I grabbed the rifle and tried to wrestle it off him. I started screaming in hopes that somebody would hear me and he yelled at me to shut up. He started hitting me around the head with the rifle. And as a result of that I received later on a stitch to a cut on the back of my head, several other bruises and cuts on the top of my head, which were bleeding quite badly and bruises to the left hand.

"At one stage I noticed that the gun was pointing down towards the floor, at a speaker of my stereo, and I tried to pull the trigger. I thought if I could get the bullets out of the chamber that it would give me time to run away, because by that stage we were slightly away from the door. I pulled the

trigger and nothing happened. And Philip yelled, 'Of course the safety catch is on.' So I pushed him and the rifle away and took off and ran to a neighbor's place for help. As I ran out the door I heard him yell, 'All right, you can shoot me then.' "

She testified that she "was convinced that he had come to kill me."

The trial court also admitted a letter which defendant subsequently sent to Barbara in which he apologized and tried to explain his actions. Defendant was convicted of "common assault" for the incident, the equivalent of a misdemeanor, and placed on probation.

Pickles, a police officer in New Zealand at the time of the incident, testified that he met with defendant later that day. Defendant had phoned the police department after leaving Barbara's flat, threatened to kill himself and asked to speak with Pickles, who testified as follows:

"* * * He was, as I say, had had a domestic problem with his wife. He was very upset at the time, looked very emotionally fragile inasmuch as I felt he had been crying and perhaps could well have been close to tears again. We spoke for some time and he was very concerned about his wife and the marital situation. He was a person that was having emotional problems.

"* * * * *

"Initially we wanted to know the incident regarding the defendant's wife, and he explained that he had been to his wife's house that morning, Christmas morning, and that he had gone there to discuss the marital problems — well, the problems they were having. He went there with his rifle. He said it was loaded and cocked. And that he gained entry just by walking into the house, the same as his wife would open the door. There was some discussion about the need for the firearm to be there and he told her that there was — that he was in a depressed state; that he was very low. And he told the Sergeant that he leveled the firearm, the rifle at her and that she grabbed it and there was a struggle. He didn't actually admit hurting her with the firearm, but he did say that he thought she had been hit several times on the head. He did say that when he pointed the gun at her initially he wanted to shoot her and himself, um, to end their love. He then made a comment that luckily during the struggle the safety catch was on and the gun did not go off. She then broke free from the fight and fled the house. And he left the house as well.

"He said that after that incident all he then wanted to do was end his own life. And that's the situation — that's how I got involved because he rang the police to say that he was going to shoot himself."

The state argues that evidence concerning the 1977 incident was properly admitted under OEC 404(3) to prove defendant's intent and the absence of mistake or accident in the shooting of his second wife. OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The first step in reviewing the admissibility of evidence of a prior act is to determine if it is relevant for a noncharacter purpose which is genuinely in issue in the case. Even relevant evidence may be excluded pursuant to OEC 403:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

In this case, the state argues that evidence of the 1977 incident is relevant to prove defendant's intent to kill his wife in the present case and to disprove the absence of mistake or accident. In this situation, intent and absence of mistake or accident are really the same issue. Proof of intent eliminates mistake or accident. The relevance of evidence of a prior act to prove intent to commit the crime charged derives from the similarity of the two acts so that the jury may reasonably infer from proof of the prior act that the defendant intentionally committed the charged act. This principle was discussed in a leading case interpreting the corresponding federal rules (FRE 403 and 404(b)), *United States v. Beechum,* 582 F2d 898 (5th Cir 1978), *cert den* 440 US 920 (1979):

"* * * Where the evidence sought to be introduced is an extrinsic offense, its relevance is a function of its similarity to the offense charged. In this regard, however, similarity means more than that the extrinsic and charged offense have a common characteristic. For the purposes of determining relevancy, 'a fact is similar to another only when the common

characteristic is the significant one for the purpose of the inquiry at hand.' * * * Therefore, similarity, and hence relevancy, is determined by the inquiry or issue to which the extrinsic offense is addressed.

"Where the issue addressed is the defendant's intent to commit the offense charged, the relevancy of the extrinsic offense derives from the defendant's indulging himself in the *same state of mind* in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense. * * *

"* * * * *

"Once it is determined that the extrinsic offense requires the *same intent* as the charged offense and that the jury could find that the defendant committed the extrinsic offense, the evidence satisfies the first step under rule 404(b). The extrinsic offense is relevant (assuming the jury finds the defendant to have committed it) to an issue other than propensity because it lessens the likelihood that the defendant committed the charged offense with innocent intent. * * * The probative value of the evidence is a matter to be weighed against its potential for undue prejudice, and the similarity of the physical elements of the charged and extrinsic offenses figures in at this stage. Therefore, we turn to the second step of the analysis required by rule 404(b), whether the evidence satisfies rule 403. `

"* * * * *

"* * * In measuring the probative value of the evidence, the judge should consider the overall similarity of the extrinsic and charged offenses. * * * The judge should also consider how much time separates the extrinsic and charged offenses: temporal remoteness depreciates the probity of the extrinsic offense. * * *" 582 F2d at 911. (Emphasis supplied; citations omitted.)

In trying to demonstrate its relevance, the state and the dissent assert that many features of the 1977 incident are similar to the circumstances of the charged murder. First, they state points to the fact that "[d]efendant's marriages to Barbara and [the victim] exhibited parallel problems prior to each respective violent incident." These include defendant's financial dependence on his wives and his inability to hold a job. In both instances defendant called the police and said that he was contemplating suicide. Second, it states that the

"physical circumstances of the two assaults are also similar. * * * In both instances, defendant, armed with a gun, unexpectedly entered his wife's premises at about 9 a.m." That statement is not supported by the evidence. In the later incident, defendant and his wife were still living together, so he did not "unexpectedly enter his wife's premises." Neither is there evidence here that he entered the house armed with a gun.

The state concludes its argument by stating, "All of the evidence, taken as a whole, demonstrates that, both in 1977 and in 1983, defendant faced similar circumstances in his marriage and reacted in a similar fashion toward his wife." The state, in effect, argues that evidence that defendant reacted to a marital separation from his wife in 1977 by assaulting her with a rifle is "highly probative" of his intent to murder his wife six years later when they also were experiencing a period of marital stress. It states that "[t]he most probable inference * * * is that defendant, when faced with a disintegrating marriage, reacts in a life-threatening manner against his wife." We think that the evidence is only relevant "to prove the character of [defendant] in order to show that [he] acted in conformity therewith." That is precisely the purpose for which evidence is *not* admissible under OEC 404(3). *See* Teitelbaum and Hertz, "Evidence of Other Crimes as Proof of Intent," 13 N Mex L Rev 423 (1983); Roth, "Understanding Admissibility of Prior Bad Acts: A Diagrammatic Approach," 9 Pepp L Rev 297 (1982). It is not relevant to the issue of his intent to kill his wife in the case at bar.

Evidence of the 1977 incident has no relevance to defendant's state of mind on November 20, 1983. First, in 1977, defendant did not kill his wife; he was convicted only of assault. Although Barbara testified that *she* thought defendant had intended to kill her, that is not the only possible conclusion as to defendant's state of mind. Because it is not clear that defendant possessed the intent to kill in the 1977 incident, the evidence could not be probative of his acting with that intent for the crime charged. Second, the circumstances of the 1977 incident are not really very similar to those in this case. In 1977, defendant was separated from his wife. Legal separation in New Zealand facilitates a divorce. Defendant's marriage to Barbara was actually ending; the relationship was not simply having problems, as was the case in his marriage to

the victim. Defendant came to Barbara's separate apartment armed with a rifle; in this case the alleged killing took place in defendant's bedroom, with a revolver. We conclude that the 1977 incident is not probative of defendant's intent to murder his wife in 1983.

Even if there were adequate relevance, it is, as a matter of law, substantially outweighed by the danger of unfair prejudice, and the evidence should have been excluded. The dissimilarity of the two incidents and the temporal remoteness of the 1977 incident lessen its probative value. The evidence was highly prejudicial in that it suggests an unfair basis for conviction: that defendant is the sort of person who assaults, and tries to kill, his wives. That is the kind of evidence which OEC 404(3) is intended to exclude. *State v. Peacock,* 75 Or App 217, 706 P2d 982 (1985); *State v. Parks,* 71 Or App 630, 693 P2d 657 (1985). We conclude that the ruling was outside the permissible range of discretion. *Carter v. Moberly,* 263 Or 193, 501 P2d 1276 (1972).

There is another factor in the admission of the evidence which troubles us and militates against its admissibility. In this case, evidence that defendant in fact pulled the trigger as well as evidence of his state of mind is circumstantial. It appears that evidence of the 1977 incident could be used to infer defendant's *act* as well as his mental state, a use which is also impermissible under OEC 404(3). In *State v. Sicks,* 33 Or App 435, 576 P2d 834 (1978), we held that evidence of the defendant's similar acts of sodomy were not admissible to prove his intent in the crime charged. We stated:

> "* * * Although the state must establish not only that defendant performed the alleged acts, but also that he did so with the requisite culpable mental element, the better view is that evidence of similar acts with other persons will not be admitted for this purpose simply because defendant has pled not guilty. * * * Where the charged acts, if proven, would by themselves strongly indicate the required state of mind, evidence of other similar acts should generally be admitted only if defendant concedes the alleged act but claims that it was inadvertent or innocent. * * *" 33 Or App at 438.

In this case, defendant did not concede that he fired the weapon, and evidence of the prior assault (which is not a very similar act) is not admissible to prove his intent when it could also be used impermissibly to imply that he did the act charged.

■     Defendant's second assignment disputes the admission of evidence concerning another act. Seven months before the victim's being shot, two women who lived in defendant's neighborhood went to his home to look at his two handguns, because they were considering buying a gun. They testified that defendant explained how to use a gun. He took the bullets out of the cylinder in their presence. He also made statements to the effect that, if they used the gun against a burglar, they should make sure the burglar was in the house and they should shoot to kill, not maim. The following testimony was also elicited:

> "A.   After he finished showing us the gun, and he was still explaining about it, I asked him about the importance of a safety. The guns that I had seen prior at one of the retail stores had a safety on it. And I asked him about the safety and rattled off a couple questions why it was important. And the gun at the time was in his hand and pointed towards the floor. And he raised the gun to my face and fired.
>
> "Q.   And what happened?
>
> "A.   It flipped me out.
>
> "Q.   What response, if any, did he have after doing that?
>
> "A.   He seemed to be humored by it.
>
> "Q.   How did he seem to be humored by it? What did he express?
>
> "A.   I don't remember what he said. But he thought it was funny."

The witness also testified that defendant had said, "That's why," referring to the need for a safety, when he pointed the gun at her and pulled the trigger. The two women stated that defendant's wife was present in the room during the encounter, sat in a chair without speaking and did not seem to be startled by what happened.

      The state argues, in support of admissibility of this evidence under OEC 404(3), that it was relevant to show, first, defendant's and the victim's "states of mind regarding firearms and, second, the matter [of] firearm safety in the context of their marriage." Regarding the victim's state of mind, the state argues that it shows why she would be uncomfortable with firearms in the house. The only aspect of the victim's

state of mind which was in issue was her fear of firearms, which could bear on the credibility of defendant's story that his wife shot at him. This evidence is not probative of her state of mind in that regard.

The state also argues that this evidence shows that defendant "was a firm believer in shooting someone in the safety of the home" and in "shooting to kill." It adds that "it is extremely noteworthy that defendant would demonstrate his attitude towards guns by pointing a gun at a woman's head and pulling the trigger, just as he did to his wife when the revolver was loaded." The state's argument reveals that its true, only thinly-veiled purpose in offering the evidence was to show an element of defendant's character to imply conduct in conformity therewith. The evidence is relevant only to show defendant's attitude toward guns and his using them to scare women. It is not relevant to any issue properly in this case. The only state of mind in issue was defendant's intent when he allegedly shot his wife. His attitude towards guns and gun safety was not in issue. The evidence was totally irrelevant and unfairly prejudicial and should have been excluded.

■ Having concluded that evidence of the two prior acts was erroneously admitted, we must now determine if that can be considered harmless error. Under Article VII (amended), section 3, of the Oregon Constitution, we are to affirm the judgment despite any errors committed if we are of the opinion "that the judgment * * * appealed from was such as should have been rendered in the case * * *." There are two requirements for affirmance despite error:

> "* * * (1) that there was substantial and convincing evidence of guilt; and (2) that the error committed was very unlikely to have changed the result of the trial. * * *" *State v. Van Hooser,* 266 Or 19, 25, 511 P2d 359 (1973).

*See also State v. Miller,* 300 Or 203, 709 P2d 225 (1985). We also are mindful of the admonition in *State v. Pruitt,* 34 Or App 957, 962, 580 P2d 201, *rev den* 283 Or 235 (1978):

> "* * * In deciding if the conviction should be affirmed despite the error, we do not try the case de novo to determine if the defendant was proven guilty absent the challenged evidence; to do so would effectively deny the defendant a right to a jury trial on issues of fact * * *."

We cannot say that evidence of defendant's guilt was

substantial and convincing. Although the state's case was a strong one, defendant's explanation was not without support in the record; it could have been believed. All of the inculpatory evidence was circumstantial, and defendant's explanation was plausible and not overwhelmingly refuted. Neither can we say that the erroneously admitted evidence was "very unlikely" to have affected the result of the trial. Evidence of defendant's prior acts was highly prejudicial in portraying him as a bad tempered man who reacts to marital stress with violence and who has a cavalier attitude toward the use of firearms. It suggested an improper basis for conviction. The evidence, improperly admitted under OEC 404(3), could very well have been considered by the jury as bearing on defendant's guilt of the crime charged. The state's claim that the evidence did not likely affect the outcome of the trial rings hollow when one considers the expense which the prosecution incurred in transporting and hosting two witnesses from New Zealand. Obviously, the state thought that the evidence was very important to its case.

Reversed and remanded for a new trial.

**ROSSMAN, J.,** dissenting.

Because I believe that the trial judge did not abuse his discretion in admitting the "other acts" evidence and that his ruling was well within the reasonable and permissible range, and because I also believe that the admission of such evidence, if error, was harmless and does not require reversal, I would affirm. Accordingly, I must respectfully dissent.

Because a finding that any error was harmless would necessarily resolve this case, I will address that issue first.

Even if the majority is correct that the trial judge committed error when he admitted the "other acts" evidence, we need not—and should not—reverse this conviction. Under Article VII (Amended), section 3, of the Oregon Constitution, and under the case law correctly cited by the majority, an appellate court must affirm despite error if two conditions are satisfied:

(1)    There is substantial and convincing evidence of guilt,

and

(2)   The error was unlikely to have changed the result of the trial.

This is the doctrine of "harmless error." In the face of the other overwhelming evidence of guilt and the unlikelihood that the exclusion of the "other acts" evidence would have changed the outcome, we should unhesitatingly apply it to this case. If ever there was a clear case for its application, this is it.

The trial resulted in a mountainous record, encompassing the testimony of 60 witnesses, over 190 exhibits, and over 1,700 pages of transcript and involved countless rulings by the trial judge. Perhaps the most salient indication of the eminent thoroughness and fairness of this proceeding is the fact that defendant was able to muster only one complaint about the conduct of the trial—the admission of the "other acts" evidence, which was a relatively small part of the prosecution's case.

The key element in a murder prosecution is *intent*. Intent is an operation of the mind. It is the equivalent of purpose. Without a confession or admission by the defendant, the only way to determine what is going on in the inner reaches of his mind is to examine his acts, conduct and other *circumstances* attending the particular act. From that examination, his mind can be read. The fact that such evidence may be *wholly* circumstantial—as the majority describes the evidence in this case—in no way reduces its probative value. It is important to be mindful that murder is not staged. Neither is it a spectator event designed to produce a perfect case for the prosecution. The best witness that the state could present in this case is dead.

It is with this backdrop that I will review what I believe to be the substantial and convincing evidence demonstrating defendant's guilt, keeping in mind that the state's theory is death by intentional homicide, while defendant's theory is death by accidental shooting by the victim.

Defendant postulates that the victim fired two shots, the first at him, which lodged in the wall and a second, fatal shot into her own head. Although two bullets were found (one through a closet door and one in the victim's head) experts were unable to determine which of the shots was fired first. Neither the victim's nor defendant's fingerprints were found

on the gun. The victim's hands did not have gun powder residue on them. Defendant's hands did. Two police officers testified that they observed a black powdery substance which they identified as gun powder residue on defendant's right middle finger, index finger and thumb. One police officer testified that he recognized the gun powder pattern on defendant's hand as consistent with that on his own hand after he had fired his revolver. The police warned defendant not to wash his hands, but he washed them before tests could confirm the officiers' observations. The officers handling the gun testified that the gun was very dirty with gun powder residue. A test firing of the gun by the state's expert left distinctive markings of gun powder residue on the inner surface of the expert's hand, particularly the index finger.

Defendant's forensic expert initially testified on direct examination that test firing of the gun, using ammunition from defendant's house, left only one or two flakes of residue. However, under cross examination, he stated that, in an earlier test using lab ammunition, "some residue" was deposited on the hands but that it was not black. He was then asked to read his report which stated that "some residue was deposited on the hand, however, the hands were not completely blackened by the residue." In any event, the question is: Why did defendant's hands get dirty while those of the victim, who supposedly fired both shots, stayed clean?

A pillow found under the victim had distinctive gun powder patterns. Defendant told the police in one version of the shooting that his hand was on the gun when the second, fatal shot was fired. The prosecution's expert tried to replicate the gun powder pattern by simulating a hand over the barrel of the gun. When he test fired it, a different pattern emerged. Only when the gun was fired uncovered did the gun powder pattern on the test pillow replicate the original.

Those tests also showed that the gun could not have been fired when pressed hard into the pillow, a position of the gun consistent with one of the defense's theories. Only if the gun was held adjacent to or lightly placed on the pillow did the test shot replicate the actual pattern of gun powder on the victim's pillow.

Experts testified that the gun was fired with the muzzle from six inches to two and one-half feet from the

victim's head. The bullet's trajectory was almost level or straight, back to front, across the top left side of the brain. Defendant's theory would require the victim to have the gun in her right hand. It seems highly unlikely that the victim's hand could have been contorted into such a position as to enable her to shoot herself in the back left side of the head with the muzzle at least six inches away.

There is, of course, the matter of defendant's gratuitous video "reenactment" of the event according to the way he remembered it. Suffice it to say that, in the light of the contrary physical evidence and simple common sense, defendant's manipulation of the victim's arm and hand into a self-inflicting position with a resulting lateral wound is too farfetched for even the most fertile imagination. As the state notes in its brief, defendant's demonstration of how his wife accidentally killed herself is reminiscent of Rose Mary Woods' demonstration of how she inadvertently erased 18 minutes of White House tapes and is even less credible.

The state's theory of an intentional shooting is confirmed by the physical evidence; the defense theory requires that we not only discount the physical evidence but also that we believe that the victim mistook her husband for an intruder and shot at him and missed, at 9 a.m., in good daylight, a few minutes after she had spoken with him and after, as the evidence indicates, he had already been in the bedroom.

Defendant's multiple accounts of what happened were also inconsistent. In some, he "dove for cover" and "hit the floor"; in others, he tripped and fell forward on the victim.

Not only does the physical evidence strongly support the theory of an intentional shooting, but the record is replete with defendant's reasons and motives for the killing. Numerous witnesses testified about defendant's marital problems and emotional state. He attempted to engage in affairs with at least two other women. He told both of them that he married the victim to get a permanent resident visa. He told one of those women that his wife was sleeping in a separate room and the other that his relationship with her was "practically nil." He also told her, "I'm not getting any help from that old bitch anymore so I'm thinking of moving back to New Zealand." He asserted that he was positive that she was having an affair and that he would kill her if he found her with another man. He

told the other woman that he was afraid his wife would get the house (which was hers from a previous marriage) in the divorce and recalled that his ex-wife had been awarded most of the property in his New Zealand divorce.

Defendant told one friend that he wanted to build a specialty motorcycle shop but that he did not have the funds; he then predicted better times to come. He told an investment counselor that he would have between $50,000 and $100,000 to invest after Christmas. His wife had a $20,000 equity in the house and insurance policies of $80,000 and $110,000 for accidental death, with defendant as beneficiary. One of the policies, which insured both spouses, was obtained in June, 1983, five months before the death. Shortly after the death, defendant said that he was going to start a business with the insurance money. Two witnesses, friends of defendant, recalled specific threats of defendant to kill or "get rid of" his wife. He also told one of these friends that "my wife is a liability not an asset and I got to figure out how to get rid of her."

Given the actual physical facts of the shooting, the lack of credibility in defendant's myriad renditions of what happened at the death scene, the outpouring of unequivocal evidence regarding defendant's reasons and motives for the killing, as well as an abundance of other circumstantial evidence, the conclusion is inescapable that defendant's guilt has been inexorably established—independently of any "other acts" evidence. It becomes exceedingly clear that any error was harmless. We should affirm this conviction.

This concludes my discussion of the harmless error question. I have proceeded on the assumption—for the sake of argument—that the trial judge did commit error when he admitted the "other acts" evidence. Although my proposed resolution of the harmless error question necessarily decides this appeal, I also believe that we should affirm the trial judge's evidentiary ruling.

The state contends that defendant *intentionally* shot and killed his wife; defendant contends that his wife's death was *inadvertent* or *accidental.* These conflicting theories formulate the key issue—defendant's state of mind at the time of his wife's demise. It was on this issue that the case was tried

and eventually submitted to the jury. Defendant was convicted. On appeal, his sole argument is that the trial judge was wrong in allowing the state to introduce evidence of two instances, so-called "other acts," for the jury's consideration on the issue of his state of mind. Specifically, the admitted evidence concerned (1) the 1977 assault by defendant against his ex-wife in New Zealand and (2) a 1983 incident involving defendant's explanation and demonstration of the use of firearms to two women in his wife's presence. The majority accepts defendant's argument that this evidence should have been excluded. I would reject it.

The question is one of *relevance.* Under the code, the test for relevance is whether the evidence being offered has some tendency to make the existence of a fact that is of consequence to the proceeding more or less probable than it would be without the evidence. OEC 401. The test is further refined in OEC 404(3), which specifically permits the admission of evidence of other acts if, *inter alia,* it shows "intent * * * knowledge, * * * or absence of mistake or accident." Applying the test here, it is quite apparent that the evidence of the two "other acts" is relevant to the central issue of defendant's state of mind.

However, just because proffered evidence satisfies the test of relevance does not mean that it is admissible. The code recognizes that, under certain circumstances, even evidence of unquestioned relevance may not be admissible. One of the well-defined reasons for exclusion—and the one on which this defendant relies—is if the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice." OEC 403. What is the meaning of "prejudice" in this context, and who decides what is and what is not "prejudice"?

It is understandable why defendant contends that the contested evidence was "prejudicial." To him, the evidence was clearly detrimental; it pointed to his guilt. However, that is not the legal standard for evaluating prejudice. If it were, the more probative the evidence of guilt, the more prejudical it would be, with the illogical result being that the clearest evidence of guilt would be inadmissible in a court of law. *The capacity of evidence to prove guilt is not determinative of prejudice.* Whether relevant evidence may be inadmissible as prejudicial depends on whether the alleged prejudice is *unfair.*

OEC 403 specifies the danger of "unfair prejudice." Unfairness is the vice. The standard is defined in the legislative commentary:

> " 'Unfair prejudice,' in the context of [OEC] 403, means an undue tendency to suggest decisions on an improper basis, commonly although not always an emotional one.* * *"

What is the role or responsibility of the trial judge in determining admissibility, when, on the one hand, the evidence being offered has probative value but, on the other, there are considerations concerning on possible prejudice? The judge becomes a weighmaster. It is his task to conduct a balancing test and to determine whether the value of the evidence outweighs or is outweighed by the contrary considerations. Because this process is an exercise of judgment, it is recognized as being subject to judicial *discretion.* Accordingly, the issue on an appeal from the trial judge's ruling is whether he abused his discretion.

In *Carter v. Moberly,* 263 Or 193, 200-01, 501 P2d 1276 (1972), the Supreme Court indicated the proper guideline for an appellate court in evaluating abuse of discretion:

> "* * * We simply determine whether, on the facts of the particular case, the trial court's ruling was within the reasonable or permissible range. We need not determine whether his ruling was the only one possible. It may be that the record will support either admission or exclusion; if so, the trial court's ruling will be affirmed, regardless of which solution we would prefer."

The rule has evolved that, unless the reviewing court can say that "the relevance of such evidence was * * * completely outweighed by prejudice to the defendant," the trial court did not abuse its discretion in admitting the evidence. *State v. Madison,* 290 Or 573, 579-80, 624 P2d 599 (1981).

Applying this test here, I am satisfied that the trial judge did not abuse his discretion. His ruling was well within the reasonable and permissible range. In support of this conclusion, I turn now to what I believe to be significant portions of the record.

The record shows that the physical aspects of the New Zealand assault, as well as the circumstances surrounding that incident, present a remarkable and chilling similarity

to the fatal shooting six years later in Beaverton. Both victims were wives of defendant. Both assaults occurred when defendant unexpectedly entered his wife's premises early in the morning; one on Christmas Day, the other on the Sunday before Thanksgiving. A gun was used in both cases.[1] In the New Zealand incident, defendant pointed a loaded rifle at his wife, Barbara, and cocked the trigger, apparently intending to kill her.[2] She pushed the gun away and managed to escape after being beaten on the head. Unlike Barbara, rather than being beaten on the head, the victim here was shot in the head. After both incidents, defendant denied any assaultive behavior. On both occasions, he called the police afterwards and talked about committing suicide.

In addition to these physical and on-the-scene similarities, the circumstances leading up to the assaults are strikingly similar. Defendant's marriages exhibited parallel problems. According to Barbara, defendant was moody and unpredictable and was also "picking and nagging" at her. He blamed her for everything wrong. He told her that, if they "couldn't be together in life, he wanted them to be together in death." He also said that he would see to it that it would be a long time before she ever trusted another man. She stated that he used these threats as emotional blackmail to get her to

---

[1] As the majority notes, the 1983 shooting was done with a *handgun,* and the New Zealand weapon was a *rifle.* The majority argues that this difference in weaponry is important, because it shows a dissimilarity between the two events. First, I would note, as a matter of law, that *exact* physical similarity is not required when the prior act is used to show absence of accident and not for identity purposes. Second, I would also note, as a matter of common sense, that *guns are guns.* Rifles are not unlike pistols. Both fire deadly projectiles when their triggers are squeezed.

[2] The majority rejects the New Zealand evidence as having any probative value, noting that, because it is not clear that defendant possessed the intent to kill in the 1977 incident, the evidence is not strongly probative of his acting with the intent for the crime charged. Barbara testified that she believed that he intended to kill her. Defendant told a New Zealand police officer that, when he pointed the gun at her initially, he wanted to shoot her and himself to end their love. He then commented that, luckily, during the struggle, the safety was on and the gun did not go off. In a letter defendant later wrote to Barbara, which was shown to the jury, he acknowledged his intent to kill her.

"Only I know you and I know what happened on Xmas Day exactly. I could have been charged with attempted murder. * * * When I loaded the gun, you did the right thing to grab it and to scream. At that point I knew I couldn't do it cold bloodly. * * * as every attempt (to get you back) was being rejected and you made it totally clear you wouldn't love me again on Xmas morning I woke so lonely for you and your touch and LOVE that if I couldn't have you in life anymore, we would be together in death."

return to him. She found that his threats and criticism caused her to lose self-confidence. She was unable to argue or to fight back.

Letters from the victim to her lover and the testimony of friends show similar marital discord in the Beaverton marriage. The letters described her husband as nagging and abusive. She wrote that he was emotionally unstable and unbalanced and that, for the purpose of hurting her, defendant falsely told her that he had cancer. According to her letters, his threats and abuse left her unable to respond or to fight back. He told her that everything that went wrong was her fault. About nine months before her death, she told a friend that defendant had threatened her with a gun.

In both marriages, defendant was financially dependent on his wife and had difficulty holding a job. On the other hand, the record indicates that both wives were quite successful in their employment and community endeavors. That caused defendant to be depressed and bitter.

Clearly, the physical evidence of the assaults, combined with the disintegration of both marriages, shows parallel circumstances.

It is very difficult for me to understand how the majority is able to conclude that the evidence has absolutely no relevance or probative value whatsoever. Clearly, the circumstances of this case are such that the trial judge could reasonably have decided either to admit or exclude the evidence. He conducted the balancing test in the exact manner that the legislature and the appellate courts have prescribed. Now, we are telling him that there was nothing for him to balance. It seems to me that, in effect, the majority has dismantled the balancing test, leaving the trial judge without any judgmental role in these kinds of cases—except for what I fear may become the mechanical response of routinely excluding evidence where there is any possibility of prejudice. The real vice in the majority's approach of excluding evidence "as a matter of law" is that we are substituting our judgment for that of the trial judge's *in an area where we do not belong.* I would prefer that we honor OEC 403 and the existing case law on this subject and not disturb the ruling of a trial judge when it is within the permissible range of reasonableness, as it was

here. Under the existing test, there is absolutely no basis for saying that the trial judge abused his discretion in admitting this evidence.[3]

I also believe that the trial judge did not abuse his discretion in admitting the testimony of the two neighbors.

About seven or nine months before the shooting, defendant invited two women neighbors into his home to see his guns. The victim was present but simply sat in a chair and never spoke. Defendant told the women that, if they were ever to use a gun against someone, to make sure that the person was inside the house and, he added, if they shot, "to make sure to kill, not to maim." He then showed the women one of his guns, which he unloaded in their presence. Later, when one of the women asked about the need for a safety on a gun, defendant raised the gun to her face, pulled the trigger and said, "That's why." The woman was terrified; defendant thought the incident amusing.

Here, too, I would hold that the facts present a situation in which the probative value of the contested evidence outweighs any arguable "unfair prejudice." How defendant and his wife handled and felt about firearms was clearly probative of their states of mind. This incident was a convincing part of that evidence. The only allegedly improper basis for the jury's use of the evidence was that defendant was careless and trigger-happy but nonetheless serious about the use of his guns. Under the facts of this case, however, those very inferences were directly probative of defendant's guilt, particularly in the light of the defense's corresponding claims about Edna's attitude toward guns. The circumstances again demonstrate one of those areas of reasonable and permissible discretion, as discussed in *State v. Madison, supra*. The decision to admit the evidence was a proper "judgment call" by the trial court and should not be disturbed on appeal.

---

[3] Moreover, as a further indication of the fairness exhibited by the trial judge, the following cautionary instruction was given to the jury:

> "The State has presented evidence that the defendant was involved in an incident with his former wife in New Zealand. This evidence is only relevant to the issue of absence of mistake or accident in the present case. You may not use this prior event in New Zealand as evidence that Mr. Johns is a bad person or is not a trustworthy person, but simply give it what weight you believe it deserves on the issue of absence of mistake or accident in the present case."

I would hold that the trial judge ruled correctly on the "other acts" evidence. We should affirm.